IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRIS MUCZYNSKI, | |
| Plaintiff, | |
| v. | No: 10-cv-0081 |
| JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO, CITY OF CHICAGO, and SERGEANT GRECO, DARRELL FARMER, THE VILLAGE OF MELROSE PARK, and MIKE FARMER, | JUDGE DARRAH  MAGISTRATE JUDGE BROWN |
| Defendant(s). | |

## FIRST AMENDED COMPLAINT AT LAW

NOW COMES the PLANTIFF, by and through Blake Horwitz, Esq. and Leah Selinger, Esq. and pursuant to this Complaint at Law, states the following against the above named Defendants, to wit Chicago Police officers JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO and Melrose Park Police Officers SERGEANT GRECO, DARRELL FARMER ("DEFENDANT OFFICERS") and MIKE FARMER, and the CITY OF CHICAGO and the CITY OF MELROSE PARK.

## JURISDICTION

1.      The jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Judicial Code, 28 U.S.C. §1331 and §1343(a); the Constitution of the United States; and this Court's supplementary jurisdiction powers.

## PARTIES

2.     PLANTIFF is a resident of the State of Illinois and of the United States.

3.     Chicago Police officers JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO were at all times relevant hereto employed by and acting on behalf of the CITY OF CHICAGO.

4.     The CITY OF CHICAGO is a duly incorporated municipal corporation and is the employer and principal of Police Officers JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO.  At all times material to this Complaint, Chicago Police Officers JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO were acting under the color of state law, ordinance and/or regulation, statutes, custom and usages of the CITY OF CHICAGO.

5.     Melrose Park Police Officers SERGEANT GRECO and DARRELL FARMER were at all times relevant hereto employed by and acting on behalf of the CITY OF MELROSE PARK.

6.     The VILLAGE OF MELROSE PARK is a duly incorporated municipal corporation and is the employer and principal of Police Officers SERGEANT GRECO and DARRELL FARMER. At all times material to this Complaint, Police Officers SERGEANT GRECO and DARRELL FARMER were acting under the color of state law, ordinance, and/or regulation, statutes, custom and usages of the VILLAGE OF MELROSE PARK.

7.     MIKE FARMER is a resident of the State of Illinois and of the United States.

## FACTS

8.     On January 11, 2008, three individuals (hereinafter "the complaining witnesses") had mace applied to their bodies at 3132 N. Harlem Ave. Chicago, Illinois.

9.      PLAINTIFF, on January 27, 2008, was peacefully enjoying the security of his home.  He was arrested by and/or due to the conduct of the DEFENDANT OFFICERS and MIKE FARMER.

10.      On or about January 27, 2008, PLAINTIFF was charged with three counts of civil battery pursuant to 720 ILCS 5/12-3(a) for the incident that occurred on January 11, 2008 at 3132 N. Harlem Chicago, Illinois.

11.      These charges were dismissed.

12.      The complaining witnesses, on the official record, indicated their desire to withdraw the criminal charges lodged against the PLAINTIFF.  As such, the criminal cause to Plaintiff was dismissed, moments thereafter.

13.       The complaining witnesses that were caused to sign the criminal charges and continue the prosecution against the PLAINTIFF, were caused to do so based on misrepresentations made to the complaining witnesses by certain of the individual defendants as well as the conspiratorial actions and joint actions undertaken by the individual defendants.

14.      On or about January 27, 2008, some or all of the DEFENDANT OFFICERS were engaged in an unreasonable seizure of the PLANTIFF and/or through joint and conspiratorial action, caused the unreasonable seizure of the PLAINTIFF.  This conduct violated the Fourth Amendment to the United States Constitution.

15.       The DEFENDANT OFFICERS arrested, charged and/or caused the charging of the PLANTIFF with simple battery, notwithstanding the fact that on January 11, 2008 (the date of the supposed battery) the PLAINTIFF had not committed said offense.  This conduct violated the Fourth Amendment to the United States Constitution.

16.     On January 11, 2008 and January 27, 2008, PLANTIFF did not obstruct justice, resist arrest, batter and/or assault any of the DEFENDANT OFFICERS.

17.     On January 11, 2008, the Plaintiff did not batter any individual(s).

18.     The individual defendants charged and/or participated in the charging of PLANTIFF with criminal activity and caused the arrest of the PLANTIFF, notwithstanding the fact that the individual defendants failed to observe and/or learn that PLANTIFF had committed criminal activity of any sort.  On January 27, 2008, the date of Plaintiff's arrest, the individual defendants did not have probable cause to believe that criminal activity took place relative to the PLANTIFF.

19.     On January 11, 2008, PLANTIFF had not committed an act contrary to the laws of the State of Illinois.

20.     The individual defendants never possessed information that PLANTIFF committed a criminal offense on January 11, 2008.

21.     The individual defendants never possessed information that PLANTIFF committed a criminal act contrary to the laws of the State of Illinois on January 11, 2008.

22.     As a direct and proximate result of one or more of the aforesaid acts or omissions of the individual defendants, PLANTIFF was caused to suffer damages.

23.     From January 11, 2008, through January 27, 2008, the DEFENDANT OFFICERS WRONKOWSKI, LIEBLICK and MASUDA were on duty at all times relevant to this Complaint and were duly appointed police officers for the CITY OF CHICAGO.  These officers engaged in the conduct complained of, on said date, in the course and scope of employment and while on duty.  This action is being brought with regard to the individual capacity of these offices.

24.     From January 11 through January 27, 2008, the DEFENDANT OFFICERS TONY GRECO and DARRELL FARMER were on duty at all times relevant to this Complaint and were

4

duly appointed police officers for the VILLAGE OF MELROSE PARK. These officers engaged in the conduct complained of, on said date, in the course and scope of employment and while on duty. This action is being brought with regard to the individual capacity of these officers.

25. Melrose Park Police Officers engage in criminal activity.

26. Melrose Park Police Officers are allowed to engage in criminal activity.

27. Many Melrose Park Police Officers engage in criminal activity and are not timely and/or adequately sanctioned.

28. The criminal actions of the Melrose Park Police Department as detailed in the subsequent paragraphs were the proximate cause of the DEFENDANT OFFICERS TONY GRECO and DARRELL FARMER's actions as alleged in this Complaint, based on inter alia, the permissive nature of the criminality and rule violations that occur at the Melrose Park Police Department.

29. On July 19, 2007, seven Village of Melrose Park employees connected to the Melrose Park Police Department were indicted on criminal charges.

30. Vito Scavo ("Scavo") was Chief of Police of the Melrose Park Police Department sometime between the years 1996 to 2006.

31. Scavo was paid by the Village of Melrose Park for his work as Chief of Police sometime between the years 1996 to 2006.

32. DOD Security Consultants, Inc. ("DOD") was a for profit private security business that operated sometime between the years 1996 to 2006.

33. IFPC Worldwide, Inc. ("IFPC") is a for profit private security company that operated sometime between the years 1996 to 2006.

34. A security officer ("security officer") is a privately employed person who is paid to protect property, assets and/or people.

35.     Security work ("security work") is work performed for a privately owned company to protect property, assets, and/or people.

36.     DOD provided security officers to businesses located within the boundaries of the Village of Melrose Park.

37.     IFPC provided security officers to businesses located within the boundaries of the Village of Melrose Park.

38.     Sometime between 1996 to 2006, Scavo had a proprietary interest in DOD Security Consultants, Inc. ("DOD").

39.     Sometime between 1996 to 2006, Scavo operated DOD (as referred to in the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

40.     Sometime between 1996 to 2006, Scavo had more than a 51% interest in DOD.

41.     Sometime between 1996 to 2006, Scavo had a proprietary interest in IFPC.

42.     Sometime between 1996 to 2006, Scavo operated IFPC (as referred to in the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

43.     Gary Montino ("Montino") worked for the Melrose Park Police Department sometime between the years 1996 to 2006.

44.     Montino worked for the Melrose Park Police Department as Deputy Chief of Police sometime between the years 1996 to 2006.

45.     Montino was paid by the Village of Melrose Park for his work as Deputy Chief of Police sometime between the years 1996 to 2006.

46.     Michael "Mickey" Caliendo ("Caliendo") worked for the Melrose Park Police Department as police officer sometime between the years 1996 to 2006.

47.     Caliendo was paid by the Village of Melrose Park for his work as a police officer sometime between the years 1996 to 2006.

48.     Scavo told and/or requested, Montino to operate IFPC, sometime between the years 1996 to 2006 (as referred to in the Government's Sentencing Memorandum *U.S. v. Caliendo,* 07 CR 458-3; see also the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

49.     Scavo told and/or requested, Caliendo to operate IFPC, sometime between the years 1996 to 2006 (See the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

50.     Scavo told and/or requested, Montino to operate DOD, sometime between the years 1996 to 2006 (See the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

51.     Scavo told and/or requested, Caliendo to operate DOD, sometime between the years 1996 to 2006 (See the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

52.     Scavo told and/or requested, Montino to operate IFPC while on the premises of the Melrose Park Police Department (See the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

53.     Montino operated DOD while on the premises of the Melrose Park Police Department (See the Government's Sentencing Memorandum *U.S. v. Caliendo,* 07 CR 458-3).

54.     Caliendo operated IFPC while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160 (See the Government's Sentencing Memorandum *U.S. v. Caliendo,* 07 CR 458-3).

55.     Caliendo operated DOD while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160 (See the Government's Sentencing Memorandum *U.S. v. Caliendo,* 07 CR 458-3).

56.    Caliendo would schedule individuals to work as security officers for DOD while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

57.    Montino would schedule individuals to work as security officers for DOD while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

58.    Caliendo would schedule individuals to work as security officers for IFPC while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

59.    Montino would schedule individuals to work as security officers for IFPC while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

60.    Caliendo told Melrose Park Police Officers to work as security officers for DOD while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

61.    Montino told Melrose Park Police Officers to work as security officers for DOD while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

62.    Caliendo told Melrose Park Police Officers to work as security officers for IFPC while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

63.    Montino told Melrose Park Police Officers to work as security officers for IFPC while on the premises of the Melrose Park Police Department at 1 N. Broadway, Melrose Park, IL 60160.

64.    A Melrose Park Police Officer is paid by the Village of Melrose Park.

65.    When a Melrose Park Police Officer is scheduled to work and reports for work on the day scheduled, that Police Officer is paid by the Village of Melrose Park.

66.    Montino scheduled Melrose Park Police Officers to perform security work for DOD while the police officers were scheduled and reported to work for the Melrose Park Police Department.

67.     While said officers in paragraph 66 were performing security work for DOD they were being paid by Melrose Park.

68.     Montino scheduled Melrose Park Police Department officers to perform security work for IFPC while the police officers were scheduled and reported to work for the Melrose Park Police Department.

69.     While said officers in paragraph 68 were performing security work for IFPC they were being paid by the Village of Melrose Park.

70.     Caliendo scheduled Melrose Park Police Department officers to perform security work for DOD while the police officers were scheduled and reported to work for the Melrose Park Police Department.

71.     While said officers in paragraph 70 were performing security work for DOD they were being paid by the Village of Melrose Park.

72.     Caliendo scheduled Melrose Park Police Department officers to perform security work for IFPC while the police officers were scheduled and reported to work for the Melrose Park Police Department.

73.     While said officers in paragraph 72 were performing security work for DOD they were being paid by the Village of Melrose Park.

74.     Montino scheduled himself to perform private security work for DOD.

75.     Montino scheduled himself to perform private security work for IFPC.

76.     Montino worked private security for DOD while he was scheduled and reported to work for the Melrose Park Police Department.

77.     Montino was paid money from DOD as a security officer for DOD.

78.     Montino was paid money from DOD for the private security work he performed for

DOD.

79.     Montino received payment from the Village of Melrose Park for the time he performed

security work for DOD.

80.     Montino received payment from the Village of Melrose Park for the time he was a

security officer at DOD.

81.     Montino was paid money from IFPC as a security officer for IFPC.

82.     Montino was paid money from IFPC for the private security work he performed for

IFPC.

83.     Montino received payment from the Village of Melrose Park for the time he performed

security work for IFPC.

84.     Montino received payment from the Village of Melrose Park for the time he was a

security officer at IFPC.

85.     Caliendo scheduled himself to perform private security work for DOD.

86.     Caliendo scheduled himself to perform private security work for IFPC.

87.     Caliendo performed private security work for DOD while he was scheduled and reported

to work for the Melrose Park Police Department.

88.     Caliendo was paid money from DOD as a security officer for DOD.

89.     Caliendo was paid money from DOD for the private security work he performed for

DOD.

90.     Caliendo received payment from the Village of Melrose Park for the time he performed

security work for DOD.

91.   Caliendo received payment from the Village of Melrose Park for the time he was a security officer at DOD.

92.   Caliendo performed private security work for IFPC while he was scheduled and reported to work for the Melrose Park Police Department.

93.   Caliendo was paid money from IFPC as a security officer for IFPC.

94.   Caliendo was paid money from IFPC for the private security work he performed for IFPC.

95.   Caliendo received payment from the Village of Melrose Park for the time he performed security work for IFPC.

96.   Caliendo received payment from the Village of Melrose Park for the time he worked as a security officer for IFPC.

97.   Caliendo was paid money from DOD as a security officer for DOD.

98.   Caliendo was paid money from DOD for the private security work he performed for DOD.

99.   Caliendo received payment from the Village of Melrose Park for the time he performed security work for DOD.

100.   Caliendo received payment from the Village of Melrose Park for the time he worked as a security officer for DOD.

101.   Caliendo was paid approximately $133,252 from DOD and/or IFPC.

102.   Officer Michael Wynn ("Wynn") was a police officer for the Melrose Park Police Department sometime between the years 1996 to 2006.

103.   Wynn was paid by the Village of Melrose Park for his work as a police officer sometime between the years 1996 to 2006.

11

104. Wynn performed private security work for DOD sometime between the years 1996 to 2006.

105. Wynn performed private security work for IFPC sometime between the years 1996 to 2006.

106. Wynn performed private security work for DOD while he was scheduled and reported to work for the Melrose Park Police Department.

107. Wynn was paid money from DOD as a security officer for DOD.

108. Wynn was paid money from DOD for the private security work he performed at DOD.

109. Wynn received payment from the Village of Melrose Park for the time he performed security work for DOD.

110. Wynn received payment from the Village of Melrose Park for the time he was a security officer at DOD.

111. Wynn performed private security work for IFPC while he was scheduled and reported to work for the Melrose Park Police Department.

112. Wynn was paid money from IFPC as a security officer for IFPC.

113. Wynn was paid money from IFPC for the private security work he performed for IFPC.

114. Wynn received payment from the Village of Melrose Park for the time he worked private security for IFPC.

115. Caliendo reported on Wynn's time records (see ¶¶ 159-161) that Wynn worked for the Melrose Park Police Department when he worked for IFPC as a security officer.

116. Caliendo reported on Wynn's time records (see ¶¶ 159-161) that Wynn worked for the Melrose Park Police Department when he worked for DOD as a security officer.

117.    The Village of Melrose Park paid Wynn for the hours Wynn performed private security work at DOD.

118.    The Village of Melrose Park paid Wynn for the hours Wynn performed private security work at IFPC.

119.    The Village of Melrose Park paid Wynn approximately $107,288 for time he spent working as a private security officer at DOD and/or IFPC.

120.    James Caputo ("Caputo") was employed by the Melrose Park Police Department between the years 1997 to 2006.

121.    Caputo was employed as Deputy Police Chief by the Melrose Park Police Department sometime between the years 1997 to 2006.

122.    Caputo was paid by the Village of Melrose Park for his work performed as Deputy Police Chief sometime between the years 1997 to 2006.

123.    In 1997, Caputo made a private deal for security services with a Sears Outlet store located in Melrose Park, Illinois ("Sears Outlet").

124.    In 1997, Caliendo made a private deal for security services with Sears Outlet.

125.    Between approximately November 1997 to approximately October 15, 2005, Melrose Park Police Officers would perform security work at the Sears Outlet.

126.    Caputo told police officers who were scheduled and reported for work for the Melrose Park Police Department to perform security work for the Sears Outlet.

127.    Caliendo told police officers who were scheduled and reported for work to perform security work for the Sears Outlet.

128.    The police officers as described in paragraphs 126 -127 would wear Melrose Park Police uniforms while they performed security work for the Sears Outlet.

129.    The police officers as described in paragraphs 126-127 would drive to the Sears Outlet in Melrose Park police marked squad cars.

130.    The police officers as described in paragraphs 126-127 would perform security work while sitting in the Melrose Park police marked squad cars.

131.    The police officers as described in paragraphs 126-127 were paid by the Village of Melrose Park for their time while they worked security at the Sears Outlet.

132.    From approximately November 1997 until approximately summer 2003, Caputo routinely hand-delivered an invoice to the Sears Outlet on a monthly basis.

133.    The invoices stated that payments should be made to Caliendo.

134.    The payments were to be mailed to the Melrose Park Police Department, 1 N. Broadway, Melrose Park, IL 60160.

135.    From approximately November 1997 until approximately summer 2003, the Sears Outlet payments were mailed to the Melrose Park Police Department, 1 N. Broadway Melrose Park, IL 60160.

136.    Caputo would receive the checks from Sears Outlet at the Melrose Park Police Department at 1 N. Broadway Melrose Park, IL 60160.

137.    Upon receiving the checks, Caputo cashed the checks at the Currency Exchange in Melrose Park, Illinois.

138.    Rocco Venute ("Venute") worked for the Melrose Park Police Department sometime between the years 1996 to 2006.

139.    Venute worked as a police officer sometime between the years 1996 to 2006.

140.    Venute was paid for his work as a Melrose Park Police Officer by the Village of Melrose Park.

141.    Between approximately the summer of 2003 through April 2005, Sears Outlet paid Venute cash for security services.

142.    Between approximately the summer of 2003 through April 2005, Sears Outlet paid Caputo cash for security services.

143.    Between approximately the summer of 2003 through April 2005, Venute would routinely pick up the cash payments from Sears Outlet while he was scheduled and reported to work as a Melrose Park Police Officer.

144.    Between approximately the summer of 2003 through April 2005, Venute would routinely pick up the cash payments from the Sears Outlet in full Melrose Park Police Officer uniform.

145.    Between approximately the summer of 2003 through April 2005, Caputo would routinely pick up the cash payments from the Sears Outlet while scheduled and reported to work at the Melrose Park Police Department.

146.    Between approximately the summer of 2003 through April 2005, Caputo would routinely pick up the cash payments from the Sears Outlet in full Melrose Park Police Officer uniform.

147.    Between approximately November 1997 through September 2005, Caputo was paid money from Sears Outlet.

148.    Between approximately November 1997 through September 2005, Caliendo was paid money from Sears Outlet.

149.    Between approximately November 1997 through September 2005, the Sears Outlet paid Caputo and Caliendo approximately $108,600.

150.    Caliendo and Caputo split the Sears Outlet proceeds of approximately $108,600.

151.    Guy Ric Cervone ("Cervone") was a Police Officer for the Melrose Park Police Department sometime between the years 1996 to 2006.

152.    Cervone was paid by the Village of Melrose Park for his work as a Police Officer sometime between the years 1996 to 2006.

153.    Cervone was a sergeant for the Melrose Park Police Department sometime between the years 2001 to 2005.

154.    Cervone was paid by the Village of Melrose Park for his work as a sergeant sometime between the years 2001 to 2005.

155.    Cervone was a lieutenant for the Melrose Park Police Department sometime between the years 2005 to 2006.

156.    Cervone was paid by the Village of Melrose Park for his work as a lieutenant sometime between the years 2005 to 2006.

157.    Sometime between March 2003 to September 2005, Cervone was in charge of the individual Melrose Park police officers time records (as referred to in the Plea Agreement *U.S. v. Guy Ric Cervone,* 07 CR 458-5).

158.    Sometime between March 2003 to September 2005, Cervone recorded the individual Melrose Park Police Officers time records.

159.    Time records are records that are kept by the Melrose Park Police Department.

160.    Time records keep track of the Melrose Park Police officers' scheduled time.

161.    Time records keep track of the Melrose Park Police officers' time reported.

162.    Time due is a phrase to refer to paid time off.

163.    Beginning no later than March 2003 and continuing until at least September 2005, Cervone manipulated the Police Department's time due records (as referred to in the Plea Agreement *U.S. v. Guy Ric Cervone,* 07 CR 458-5).

164. Scavo told and/or requested, many Melrose Park Police Officers to conduct personal chores for Scavo.

165. Scavo told and/or requested, many Melrose Park Police Officers to conduct personal errands for Scavo.

166. Scavo told and/or requested, Cervone to record the time of the Melrose Park Police Officers who participated in these personal chores for Scavo as time due.

167. Scavo told and/or requested, Cervone to record the time of the Melrose Park Police Officers who participated in these personal errands for Scavo as time due.

168. On or about September 21, 2005, Cervone told Melrose Park Police Officers to lie to federal agents.

169. On or about September 21, 2005, Cervone told Melrose Park Police Officers to lie to the grand jury.

170. On or about September 21, 2005, Cervone told Melrose Park Police Officers to lie about how they were paid time due.

171. Sometime in 2005, Cervone lied to federal investigators regarding time due.

172. Sometime in 2005, Cervone lied to federal investigators regarding individual Melrose Park Police Officers time records.

173. Sometime in 2005, Cervone lied to federal investigators regarding time due on individual Melrose Park Police Officers time records.

174. In March 2005, German Cepeda ("Cepeda") was employed by the Village of Melrose Park as a Code Enforcement Inspector.

175. Cepeda was employed by the Village of Melrose Park sometime between the years 1996 to 2006.

176.    Cepeda was paid by the Village of Melrose Park for his work as Code Enforcement Officer.

177.    In or about March 2005, Cepeda approached the owner of Copacabana Bar.

178.    In or about March 2005, Cepeda met with the owner of Copacabana bar regarding security work.

179.    In or about March 2005, Cepeda met with the owner of Copacabana bar regarding the hiring of security officers.

180.    In or about March 2005, Cepeda told the owner of Copacabana Bar that if she did not want to be bothered by the Melrose Park Police Department she would have to hire security from Melrose Park (as referred to in the Government's Sentencing Memorandum, *U.S. v. Cepeda,* 07 CR 458-7).

181.    The owner of Copacabana Bar was paying Cepeda in cash $30 an hour for the security guards working at her bar.

182.    Cepeda collected the cash from the owner of the Copacabana Bar.

183.    The cash collected from the Copacabana Bar by Cepeda was given directly to Scavo and/or Scavo's secretary.

184.    Between March 2005 to September 2005, Cepeda collected approximately $4,000 from the owner of Copacabana Bar.

185.    Portions of the $4,000 dollars collected from the owner of Copacabana Bar went to profit Scavo individually.

186.    Scavo told and/or requested, Cepeda to tell the owner of Copacabana to lie to federal investigators.

187.   Cepeda told the owner of Copacabana to tell federal investigators that the security officers working at Copacabana Bar were being paid $20 an hour.

188.   Cepeda told the owner of Copacabana to tell federal investigators that the security officers working at Copacabana Bar were being paid directly from her.

189.   Sometime in 2005, Scavo met personally with two security customers in the aisles of a Walmart.

190.   Scavo told the two security customers to lie to the federal investigators.

191.   Scavo told the two security customers to lie to the federal investigators regarding Cepeda's involvement with the security companies.

192.   Scavo told Venute to lie to federal investigators regarding overtime payments.

193.   Scavo told Venute to lie to the grand jury regarding overtime payments.

194.   The International Truck and Engine Corporation, formerly known as Navistar (hereinafter "Navistar"), is a company located in Melrose Park.

195.   Navistar has a commercial parking lot located on its property.

196.   Navistar provided free use of its parking lot to the Village of Melrose Park and/or the Melrose Park Police Department.

197.   Navistar provided the use of the parking lot as a public service.

198.   Navistar provided the use of the parking lot for the annual Haunted House.

199.   The Navistar parking lot was used by Scavo during the months on or about October 2004 and October of 2005.

200.   Customers of the annual Haunted House who parked in the Navistar parking lot paid for the use of the Navistar parking lot.

201.    Scavo received approximately $8,000 from the customers parking at the Navistar parking lot in October of 2004.

202.    In or about October of 2004, Scavo split the proceeds with Venute.

203.    Scavo also paid a portion of the proceeds to a Navistar employee.

204.    Navistar did not receive payment from Scavo for the use of its commercial parking lot.

205.    The Village of Melrose Park did not receive any money from the proceeds collected at the Navistar commercial parking lot.

206.    The Melrose Park Police Department did not receive any money from the proceeds collected at the Navistar commercial parking lot.

207.    Allied Waste Services ("Allied") is a company located in Melrose Park.

208.    On or about October of 2003, Scavo met with the owner of Allied.

209.    On or about October of 2003, Scavo met with the owner of Allied regarding security work.

210.    On or about October of 2003, Scavo met with the owner of Allied regarding security officers.

211.    Previous to the meeting with Scavo, Allied had security officers working for Allied.

212.    The security officers working for Allied were hired from a private security company located in Rosemont.

213.    The security officers working for Allied previous to the meeting with Scavo were paid $17 per hour.

214.    After the meeting with Scavo the security officers working for the security company located in Rosemont were fired.

215.    After the meeting with Scavo security officers from DOD were hired by Allied.

216.     Allied paid Scavo $45 an hour for the DOD security officers who performed security work for DOD.

217.     On or about October of 2003, Scavo through his official position convinced Allied to use security officers provided by DOD.

218.     On or about October of 2003, Scavo through fear of economic harm convinced Allied to use security officers provided by DOD (as referred to in the Government's Sentencing Memorandum *U.S. v. Scavo,* 07 CR 458-1).

219.     In total, DOD charged $12,600 for the security guards provided to Allied.

220.     Scavo operated DOD predominantly as a cash business.

221.     When certain customers paid by check, Scavo had those checks cashed.

222.     Scavo did not deposit checks received by DOD in a bank account.

223.     From the years 2001 to 2004, Scavo did not report the cash received on DOD's tax returns.

224.     From the years 2001 to 2004, Scavo did not report on his individual federal income tax returns income he received personally from DOD.

225.     Failure to recognize and/or discipline the Melrose Park Police Departments' actions as detailed in paragraphs 29 to 224 for criminal acts which span across a decade is a proximate cause to the acts of misconduct of the DEFENDANT OFFICERS TONY GRECO and DARRELL FARMER to this cause as alleged in this complaint.  Based on this failure to discipline and lack of recognition, the DEFENDANT OFFICERS believed that they could engage in acts of misconduct without being disciplined and/or punished.

226.     Specifically, Scavo and the other identified Melrose Park employees' acts of lying to and convincing others to lie to federal investigators and the grand jury is a proximate cause to the acts

of DEFENDANT OFFICERS TONY GRECO and DARRELL FARMER to this cause as alleged in this complaint.

### CONSPIRACY

227.    The individual defendants  conspired to cause damage to PLANTIFF in the following manner:

        a.   agreeing to falsely arrest the PLANTIFF;

        b.   agreeing to falsely institute criminal charges/proceedings against the PLANTIFF;

        c.   agreeing to cause false charges to be lodged against the PLAINTIFF;

        d.   agreeing not to report each other after falsely arresting and/or charging the PLAINTIFF;

        e.   generating false documentation to cover-up for their own and each other's misconduct.

In connection with the above conspiracy, the individual defendants specifically engaged in communication among themselves, between January 11, 2008 and January 27, 2008 and upon information and belief, for a period of time thereafter, whereby the individual defendants agreed to facilitate, engage in and support the activity which occurred in connection with the allegations immediately above.  As a result of this conspiracy, the individual defendants by and through their conduct, proximately caused PLANTIFF to, *inter alia*, be charged with criminal allegations, incur financial losses, including attorneys' fees and lost wages, and suffer emotionally.

228.    The actions of the DEFENDANT OFFICERS and the individual defendant Mike Farmer, in engaging in the above referenced cover-up, which led to the generation of false documentation and criminal charges to be lodged against PLAINTIFF, demonstrate that the DEFENDANT OFFICERS failed in their duty to enforce the laws equally and fairly towards the PLAINTIFF,

therefore violating the Equal Protection Clause. The individual defendants acted with discriminatory intent by treating PLAINTIFF differently, trying to cause further injury to PLAINTIFF by illegally generating false evidence and causing him to be criminally prosecuted.

229.    In connection with this Equal Protection Claim, PLAINTIFF was a "Class of One."  In that regard, PLAINTIFF was treated with ill will and/or discriminated against with no rational basis.    The individual defendants, in joint action, acted with discriminatory intent by treating PLAINTIFF differently and trying to cause further injury to PLAINTIFF by generating false evidence against PLAINTIFF.  Further, PLAINTIFF was similarly situated to other individuals involved in incidents with police officers that did not have false evidence and/or documentation generated against them.

230.    Upon information and belief, the DEFENDANT OFFICERS, each of them, have arrested over 20 individuals prior to the arrest of the PLAINTIFF.

231.    Upon information and belief, on at least 20 occasions prior to January 27, 2008 the DEFENDANT OFFICERS, each of them, have not falsified police reports.

232.    Upon information and belief, on at least 20 occasions prior to January 27, 2008 the DEFENDANT OFFICERS, each of them, have not partaken in, or contributed to, the falsification of police reports.

233.    The DEFENDANT OFFICERS, each of them, have been trained, prior to January 27, 2008, that upon the signing of a criminal complaint, there is a strong likelihood that a criminal action will commence against the party against whom the allegations are submitted in a criminal complaint.

234.     Upon information and belief, JACK LIEBLICK, on at least 20 occasions prior to and/or after January 27, 2008, has arrested individuals and has not falsified information contained within a police report with regard to the arrest.

235.     Upon information and belief, JACK LIEBLICK, on at least 20 occasions prior to and/or after January 27, 2008, has signed criminal complaints and has not falsified information contained within said charging instrument(s).

236.     On January 27, 2008, there was no reasonable reason for JACK LIEBLICK to falsify a police report and/or criminal complaint with respect to PLAINTIFF.

237.     Upon information and belief, PATRICK MASUDA, on at least 20 occasions prior to and/or after January 27, 2008, has arrested individuals and has not falsified information contained within a police report with regard to the arrest(s).

238.     Upon information and belief, PATRICK MASUDA, on at least 20 occasions prior to and/or after January 27, 2008, has signed criminal complaints and has not falsified information contained within said charging instruments.

239.     On January 27, 2008 there was no reasonable reason for PATRICK MASUDA to contribute to a falsified police report and/or criminal complaint with respect to PLAINTIFF.

240.     Upon information and belief, DETECTIVE WRONKOWSKI, on at least 20 occasions prior to and/or after January 27, 2008, has arrested individuals and has not falsified information contained within a police report with regard to the arrest.

241.     Upon information and belief, DETECTIVE WRONKOWSKI, on at least 20 occasions prior to and/or after January 27, 2008, has signed criminal complaints and has not falsified information contained within said charging instrument(s).

242.    On January 27, 2008 there was no reasonable reason for DETECTIVE WRONKOWSKI to falsify a police report and/or criminal complaint with respect to PLAINTIFF.

243.    Upon information and belief, JEFFRFEY LOQUERCIO, on at least 20 occasions prior to and/or after January 27, 2008, has arrested individuals and has not falsified information contained within a police report with regard to the arrest.

244.    Upon information and belief, JEFFREY LOQUERCIO, on at least 20 occasions prior to and/or after January 27, 2008, has signed criminal complaints and has not falsified information contained within said charging instruments.

245.    On January 27, 2008 there was no reasonable reason for JEFFREY LOQUERCIO to falsify a police report and/or criminal complaint with respect to PLAINTIFF.

246.    Upon information and belief, neither DARRELL FARMER nor TONY GRECO, on at least 20 occasions prior to or after January 27, 2008, have signed criminal complaints and/or contributed to police reports that contained information known to be false.

## COUNT I
### § 1983 Equal Protection – Class of One

247.    PLAINTIFF re-alleges paragraphs 1 – 246 as though fully set forth herein.

248.    The joint action of the individual defendants, in conspiring to cause the arrest, criminal prosecution and continued prosecution of the PLAINTIFF, violated the Equal Protection clause to the United States Constitution.

249.    The aforementioned actions of the individual defendants were the direct and proximate cause of the constitutional violations set forth above.

WHEREFORE, PLAINTIFF demands compensatory damages from the individual defendants.  PLAINTIFF also demands punitive damages, costs and attorneys' fees against the

25

individual defendants.  PLAINTIFF also demands whatever additional relief this Court deems

equitable and just.

**COUNT II**
**False Arrest Claim Pursuant to**
**42 U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution**

250.    PLANTIFF re-alleges paragraphs 1 – 246 as though fully set forth herein.

251.    The actions of the individual defendants caused the arrest of the PLAINTIFF without

probable cause to believe that the PLAINTIFF had committed criminal activity.

252.    Therefore, the conduct of the individual defendants was in violation of the Fourth

Amendment to the United States Constitution.

253.    The aforementioned actions of the individual defendants were the direct and proximate

cause of the Constitutional violations set forth above.

WHEREFORE, PLANTIFF demands compensatory damages from the individual

defendants.  PLANTIFF also demands punitive damages, costs and attorneys' fees against the

individual defendants and whatever additional relief this Court deems equitable and just.

**COUNT III**
**§ 1983 Conspiracy Claim**

254.    PLANTIFF re-alleges paragraphs 1 – 246 as though fully set forth herein.

255.    The aforementioned actions of the individual defendants were the direct and proximate

cause of the violations of the United States Constitution.

WHEREFORE, PLANTIFF demands compensatory damages from the individual

defendants named in this Complaint.  PLANTIFF also demands punitive damages, costs and

attorneys' fees against the individual defendants and whatever additional relief this Court deems

equitable and just.

<u>**COUNT IV**</u>
<u>**§ 1983 Fourteenth Amendment Violation of Due Process**</u>

256.  PLAINTIFF re-alleges paragraphs 1 – 246 as though fully set forth herein.

257.  The joint action of the individual defendants, in conspiring to cause the arrest, criminal prosecution and continued prosecution of the PLAINTIFF and the generation of falsified criminal allegations and police reports in connection thereto, violated the Fourteenth Amendment to the United States Constitution.

258.  The aforementioned actions of the individual defendants were the direct and proximate cause of the constitutional violations set forth above.

WHEREFORE, PLAINTIFF demands compensatory damages from the individual defendants.  PLAINTIFF also demands punitive damages, costs and attorneys' fees against the individual defendants.  PLAINTIFF also demands whatever additional relief this Court deems equitable and just.

<u>**COUNT V**</u>
<u>**745 ILCS 10/9-102 Claim Against the CITY OF CHICAGO**</u>

259.  PLANTIFF re-alleges paragraphs 1 – 246 as though fully set forth herein.

260.  Defendant CITY OF CHICAGO is the employer of the individual defendants Chicago Police officers JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO.

261.  Chicago Police officers JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO, as alleged above, committed the acts under color of law and in the scope of employment of the CITY OF CHICAGO.

WHEREFORE, should the individual defendants be found liable for any of the alleged counts in this cause, PLAINTIFF demands that, pursuant to 745 ILCS 10/9-102, the CITY OF

CHICAGO pay PLANTIFF any judgment obtained against the Chicago Police officers JACK LIEBLICK, PATRICK MASUDA, DETECTIVE WRONKOWSKI, JEFFREY LOQUERCIO as a result of this Complaint.

### COUNT VI
### 745 ILCS 10/9-102 Claim Against the CITY OF MELROSE PARK

262.    PLANTIFF re-alleges paragraphs 1 – 246 as though fully set forth herein.

263.    Defendant CITY OF MELROSE PARK is the employer of individual defendants Melrose Park Police Officers SERGEANT GRECO and DARRELL FARMER.

264.    Melrose Park Police Officers SERGEANT GRECO and DARRELL FARMER, as alleged above committed the acts under color of law and in the scope of employment of the CITY OF MELROSE PARK.

WHEREFORE, should the individual defendants be found liable for any of the alleged counts in this cause, PLANTIFF demands that, pursuant to 745 ILCS 10/9-102, the CITY OF CHICAGO pay PLANTIFF any judgment obtained against Melrose Park Police Officers SERGEANT GRECO and DARRELL FARMER as a result of this Complaint.

### COUNT VII
### MONELL CLAIM AGAINST THE CITY OF MELROSE PARK

265.    The Plaintiff re-alleges paragraphs 1 - 246 as though fully set forth herein.

266.    It is the custom, practice and policy of police officers and/or there supervisors/agents and/or other employees of the City of Melrose Park to perform the following acts and/or omissions in connection with the false arrest count that is directed at the City of Melrose Park police officers:

        a.    Supervisory individuals from the City of Melrose Park fail to properly discipline Melrose Park police officers that have committed a false arrest without probable cause;

      b.  Supervisory individuals from the City of Melrose Park fail to properly investigate a civilian complaint to determine if there is probable cause to arrest an individual;

      c.  Supervisory individuals from the City of Melrose Park fail to take proper remedial action against a City of Melrose Park Police officer once it is determined that he/she has committed an arrest of an individual without probable cause;

      d.  Supervisory individuals fail to give proper training to Melrose Park police officers regarding the probable cause needed when arresting an individual.

267.  As a result of the misconduct undertaken by the City of Melrose Park, through it employees, the Plaintiff suffered serious injuries, as the custom, practice and policy of the City of Melrose Park permits and/or makes conducive to the City of Melrose Park police officers, the type of conduct that occurred in the instant cause, as alleged in this complaint.

      WHEREFORE, Plaintiff demands judgment against the City of Melrose Park, plus attorney's fees and costs.  Plaintiff also demands whatever additional relief this Court deems equitable and just.

## JURY DEMAND

272.  PLANTIFF demands trial by jury.

                Respectfully submitted,

                s/ Leah Selinger
                Attorney for the Plaintiff

**THE BLAKE HORWITZ LAW FIRM**
Two First National Plaza

20 S. Clark St., Suite 500
Chicago, Illinois 60603
Ph (312) 676-2100
Fax (312) 372-7076